UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

In the Matter of Osseo Area Public Schools,
Independent School District No. 279,              Civil File No.
_____

            Plaintiff,        **COMPLAINT AND APPEAL OF**
                                                  **HEARING OFFICER DECISION**
                                                  **PURSUANT TO 20 U.S.C. § 1415(i)(2)**
v.

A.J.T., by and through her Parents,
A.T. and G.T.

            Defendants.

---

Osseo Area Public Schools, Independent School District No. 279 ("District") appeals the Findings of Fact, Conclusions of Law and Order ("Decision") of the Administrative Law Judge ("ALJ") dated April 21, 2021 in the Office of Administrative Hearings Docket No. 8-1300-37093 and the Minnesota Department of Education ("MDE") Case No. 21-007H in its entirety, except for the ALJ's correct determination of the applicable statute of limitations.

**I.**    **Jurisdiction and Venue.**

This action is an appeal of the April 21, 2021 Decision from the state level due process hearing decision[1] held pursuant to the federal Individuals with Disabilities

---

[1] Exhibit 1 (ALJ Decision).

Education Act ("IDEA") and corresponding Minnesota law. *See* 20 U.S.C. § 1415(i)(2)(A); Minn. Stat. § 125A.091, subd. 24.

1. This Court has jurisdiction over the appeal of the Decision pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331.

2. Venue in this district is authorized by 28 U.S.C. § 1391(b) because the defendants are residents of the State and reside within this Judicial District, and the events giving rise to the Complaint occurred within this Judicial District.

## II. Parties.

1. Plaintiff Osseo Area Schools, Independent School District No. 279, ("Osseo" or "District") is a public school district in Minnesota. The District is an award-winning school system that inspires and prepares all students with the confidence, courage, and competence to achieve their dreams; contribute to community; and engage in a lifetime of learning. It is the fifth-largest school district in the state, serving all or parts of Brooklyn Center, Brooklyn Park, Corcoran, Dayton, Maple Grove, Osseo, Plymouth, and Rogers, Minnesota. The District serves approximately 20,000 students from pre-kindergarten through grade twelve in seventeen elementary schools, four middle schools, and three senior high schools. It provides education beyond grade twelve through its adult learning and special education transition programs. The District provides special education services to students from birth to age 21.

2. The District, under the management and control of its duly elected School Board, administers the public schools situated within District boundaries. The District's principle office is located at 11200 93rd Avenue North, Maple Grove, Minnesota 55369.

3. G.T. is the mother of A.J.T. and A.T. is her father. They reside with their daughter, A.J.T. within the boundaries of the School District.

### III. Factual Background.

1. **The Student.** A.J.T. is a fifteen-year-old girl who has Lennox-Gastaut Syndrome ("LGS"). LGS is a severe, intractable form of epilepsy. A.J.T. has seizures continually throughout the day. As a result of her condition, she has a significant cognitive disability and developmentally functions in the approximate range of an 18-month old child. She does not speak but communicates primarily using eye-gaze. Eye-gaze requires her to look at a preferred item so that her communication partner knows her choice. A.J.T. also uses a few sign language approximations and gestures to communicate. She walks only with assistance and is vulnerable to injury because she is unsteady in her gait. She requires constant adult supervision because of her seizures and the impact that they have had over time on her ability to control her bodily movements. The Student is not toilet-trained and needs assistance in all areas of daily living.

2. In school, A.J.T. receives special education services throughout her school day with a focus on learning to communicate her wants and needs. She is

       beginning to learn to imitate others, to take turns and to share joint attention with another person (looking at or listening to something when another person calls attention to it.)

3. Dr. Karen Wills, a board-certified pediatric neurologist who has evaluated over 500 youth with severe intellectual disabilities and on more than 7,000 students' educational programming, testified that the Student has made progress in school. She has demonstrated distinct improvement with "using the signs she has consistently and with diminished prompting [and] less of a need for…hand-over-hand reminders for the eat and drink and treat [sign language approximations] that she uses pretty predictably."

4. Dr. Wills also testified that the Student was showing "distinct improvement" in visually tracking a person or object, looking at people's faces, smiling and laughing, and initiating and sustaining some turn taking like throwing a ball back and forth with another person. She testified that A.J.T. was also progressing in using eye gaze to attend to or look at pictures.

5. Dr. Wills testified that the Student is beginning to be interested in her peers and what they are doing. She testified that pleasure, enjoyment, amusement and curiosity are intrinsically reinforcing experiences and those experiences are powerfully reinforcing and motivating for the individual. This interest in others is an important strength for persons with profound disabilities, Dr.

        Wills testified, because it allows the person to interact with others in a positive way and obtain positive responses from other people.

6. The educators working with A.J.T., Joy Fredrickson, Pamela Kohlhepp, and Teresa Elliot testified that the Student made a lot of gains in not only her desire to communicate with others, but her ability to use eye gaze to answer questions and make choices and to obtain adult attention. Ms. Elliot who is the Student's current teacher, testified that she absolutely made progress in her communication including being able to make a choice of what she wanted to eat and who she wanted to do an activity with or work within school.

7. The School District's expert witness Debra West an experienced teacher of students with significant cognitive disabilities including students with LGS, testified that the Student made progress based on the data collected and reported in March of 2020.

8. Individuals with LGS often regress in all areas of functioning because of the impact of the constant seizures on brain function.

9. The record is devoid of any evidence that the Student has regressed in any of her skills during the approximately five years that she has attended the Osseo Area Public Schools.

10. No expert witness testified that the Student had regressed in her skills during the five years she has been educated in the District. Dr. Wills and

Ms. West testified that they reviewed the Student's entire educational record and saw no evidence of regression of skills.

11. A.J.T.'s teachers testified that she has not regressed in her skills during her tenure in the District.

12. Dr. Wills testified that given the severity and frequency of A.J.T.'s seizure disorder, she well could have regressed in her functional and communication skills but she did not. She opined that many students with LGS do regress making this achievement even more important for A.J.T.

13. **The Statute of Limitations.** The ALJ ruled on February 1, 2021 that the appropriate statute of limitations was four years. The hearing in this matter took place over five days in February of 2021. The hearing included evidence and argument over a five-year period of time. And the ALJ relied on that evidence in his Decision. (*See e.g.*, Decision page 16, fn. 101, 102)

14. Only after the hearing was concluded, did the ALJ reverse his earlier decision on the statute of limitations. The ALJ held that the appropriate statute of limitations was two years from the date of the filing of the hearing request. He relied on a decision from the Minnesota Federal District Court issued in January of 2021, *M.L.K. v. Minnetonka, Minnetonka Pub. Schs. v. M.L.K.*, No. CV 20-1036 (DWF/KMM), 2021 WL 780723, at *6 (D. Minn. Mar. 1, 2021), *appeal docketed,* Nos. 21-1707, No. 21-1770 (8th Cir. 2021). The Eighth Circuit Court of Appeals precedent for this decision was from years prior (*I.S.D. NO. 283 v. EMDH*,

960 F.3d 1073,1083 (8th Cir. 2020) (*C.B. v. Spec. Sch. Dist. No. 1*, 636 F.3d 981, 989 (8th Cir. 2011), *Lathrop v. Gray*, 611 F.3e 419, 428 (8th Cir. 2010)). The ALJ had been apprised of that law in the District's motion filed on January 20, 2021 prior to the hearing. Moreover, the ALJ should have known of the Circuit Court's rulings from 2010 on. The ALJ did not follow the Eighth Circuit's precedent.

15. Consequently, at issue in this case should have been whether the Student received a FAPE from September 14, 2018 to September 14, 2020.

16. **The Student's School Day.** During the 2018-2019 school year, A.J.T. attended Cedar Island Elementary. The regular school day at Cedar Island Elementary began at 9:30 a.m. and concluded at 4:00 p.m. A.J.T. was excused from attending school in the morning and attended school from the hours of 12:00 p.m. to 4:15 p.m. each school day. The excusal was based on a letter from a physician indicating that the Student should not attend school until noon.

17. In April of 2018, the Parents proposed that the noon to 4:15 p.m. schedule remain in place when the Student began middle school in the 2019-2020 school year. They eventually withdrew their proposal and asked that the District educate the Student from noon to 6:00 p.m. or 6:30 p.m. with some of the education to be delivered in their home in the evenings.

18. A.J.T. began attending Maple Grove Middle School ("MGMS") at the start of the 2019-2020 school year, where she continued to attend school from

the hours of 12:00 p.m. to 4:15 p.m.  The regular school day at MGMS begins at 8:10 a.m. and concludes at 2:40 p.m.

19. The District has educated other students with L.G.S. and those students have had a flexible start time in the morning to accommodate for any seizure activity or impact of seizure activity that occurs in the morning hours. Those students generally arrive either with their peers or if they have seizure activity in the morning that impacts their ability to attend, they come to school when they are ready.

20. A.J.T., like many students with seizure disorders and most students with L.G.S., has more seizure activity in the mornings. As a result, her family has established a routine that has her attending school at noon. She comes to school precisely at noon regardless of her morning seizure activity. Her parents have chosen this as her best start time.

21. Each year that A.J.T. has attended the District's schools, the Parents have provided a very brief note from a medical doctor indicating that the Student should be excused from attendance before noon each day.

22. Each year, the District has honored this request for A.J.T. to begin at noon and each year it has provided special education services after the close of the regular school day. No other middle school student attends school after 2:40 p.m. each day. The Student is educated by a teacher and a paraprofessional from 2:40 to 4:15 p.m. each day. The Student has always attended school after her peers left for the day in this format.

23. While many students in the District have altered school days because of medical or mental health needs; no student starts promptly at noon, none is educated after the other students have left and only those whose medical needs are so significant that they must be educated at home, have teachers coming into their homes.

24. There is no evidence in the record that A.J.T. has medical needs that require her to be educated in her home for part of her school day.

25. The District has addressed A.J.T.'s unique medical and family circumstances by accommodating her noon start time and elongating the typical day by two hours.

## IV. Due Process Hearing.

1. The Parents requested a due process hearing on September 14, 2020. They alleged violations of the IDEA based on the fact that the Student did not receive a six and a half hour school day like her non-disabled peers. They alleged violation of the IDEA over six years – from the time that A.J.T. enrolled in the District in October of 2015 to September 14, 2020.

2. ALJ Lipman was assigned to hear this matter by the Office of Administrative Hearings.

3. The Parents moved to remove ALJ Lipman based on claims that he discriminated against students with disabilities based on two prior rulings and that he discriminated against the Parents' attorney based on her sexual orientation. There was not a single fact pled or argument raised supporting

the allegation that ALJ Lipman had treated the Parents' attorney in a discriminatory manner. The Chief ALJ denied the Parents' request; however, the strategy appears to have impacted the ALJ's impartiality toward the School District and its employee experts and expert witnesses as he completely discounted their testimony and evidence in favor of the Parents' witnesses.

4. The Parents then moved for summary disposition arguing that all students in Minnesota pursuant to state law are entitled to six and one-half hours of school daily. The Motion was denied by ALJ Lipman.

5. The Parents requested delay in the hearing to allow their expert witness to conduct testing of A.J.T. during the evening hours. He conducted the trials remotely between the hours of 4:00 p.m. and 5:30 p.m.

6. During the time that the Parents' expert was conducting remote trials in their home, the Student was receiving instruction virtually due to the COVID-19 pandemic and resulting school closures.

7. The Parents' expert opined that the Student would likely experience more progress if she had more school hours. He testified that he did not know how returning to in-person school might impact the Student and her ability to be available for instruction from noon to 6:30 p.m. Regardless, he speculated that more instruction in the evenings at home would benefit the Student. Parents' expert could not opine about her availability for instruction after 5:30 p.m. because his trials ended by 5:30 p.m.

8. Pam Kohlhepp, who was the Student's teacher for three years in elementary school, testified that she questioned whether the Student would be alert and available for instruction after a full school day and between the requested hours of 4:15 p.m. to 6:30 p.m.

9. The record indicated that A.J.T.'s neurologist and private speech therapist discontinued private speech sessions when school started because "[the Student] did not have the capacity to do outpatient services on top of school."

10. Dr Wills testified simply "it is a no-brainer that more instruction is a benefit for any student. That is a different thing from saying its necessary."

11. The ALJ found that the Student should be educated in the future after her regular school day from 4:15 p.m. to 6:00 p.m. in her home.

V. **Grounds for Appeal.**

1. **Decision.** The ALJ's Decision was legally and factually erroneous.

2. **Statute of Limitations Order.** The Eighth Circuit jurisprudence makes it clear that the IDEA's statute of limitations is two years and that compensation should be limited to the amount of time and services needed to compensate students for the deprivations that occurred during the two years before the filing of the due process complaint. *C.B. ex rel. B.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 989 (8th Cir. 2011); *Lathrop R-11 Sch. Dist. v. Gray*, 611 F.3d 419, 428 (8th Cir. 2010); *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d 954, 957-59 (8th Cir. 2000); see also *Indep.*

*Sch. Dist. No. 413 v. H.M.J.*, 123 F. Supp. 3d 1100, 1113 (D. Minn. 2015); *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 357 F. Supp. 3d 876, 888–89 (D. Minn. 2019) (appealed to 8th Circuit); *R.M.M. v. Minneapolis Pub. Sch.*, No. 15-CV-1627, 2017 WL 2787606, at *6 (D. Minn. June 27, 2017).

3. The ALJ erred when he initially determined the statute of limitations to be four years. He compounded the error when he did not reverse his decision until after the hearing was concluded and did not take into account the fact of the appropriate limitations period. The initial statute of limitations order was legally and factually erroneous.

4. The ALJ erroneously relied on alleged violations of the law that occurred prior to September 14, 2018. He erred when he determined that the District did not provide services to the Student after 4:15 p.m. based on administrative convenience as a result.

5. The ALJ erred when he ordered in home education when there was not testimony that the Student's needs required her to be educated in the home.

6. The ALJ erred when he ordered in home education until 6:00 p.m. because there is no evidence that the Student would be able to sustain attention and be available for education after 5:30 p.m. There is no data or objective evidence in the record supporting in home instruction and none to support in home instruction after 5:30 p.m.

7. There was no testimony or other evidence establishing whether the Student suffered educational harm during the applicable two year period. In fact,

that was no evidence that the Student suffered any educational harm - only the speculation by Parents' expert witness that A.J.T. could be educated between 4:00 and 5:30 p.m.

8. The ALJ erred when he found that the IEP that did not include "supplemental instruction home (sic) in the afternoon did not afford the Student" a free, appropriate public education ("FAPE").

9. The ALJ erred when he found that the "School District has struggled in making progress on [the Student's[2]] IEP because he found that Teresa Elliot had "confided" to the Parents' expert that some objectives could not be implemented in the Student's 4.25 hour school day. Assuming he meant that the District struggled somehow to implement the IEP and therefore, A.J.T. did not make progress, the evidence does not support either conclusion. Ms. Elliot testified under oath that she did not say this to Parents' expert. Moreover, her uncontroverted testimony was that she wrote the IEP after the length of day had been determined and would not have written in objectives that she could not serve. No witness testified that the A.J.T. struggled to make progress – instead, the great weight of the evidence was that despite her intractable seizure activity, the Student did make progress.

---

[2] The ALJ identifies the Student as "Gamma"; we use "Student" or "A.J.T." out of respect for the Student.

10. The ALJ erred when he considered only the Parents' expert witness speculative testimony that the Student would "likely" make more gains with more instruction. He applied the wrong legal standard in determining that the Student did not have a FAPE during the two school years at issue.

11. The ALJ erred when he ignored the educators' opinions that the Student was benefitting from an intensive 4.25 hour school day.

12. The ALJ erred when he allowed the Parents to delay the hearing to conduct trials in order to have their expert provided speculative evidence of possible progress.

## VI. Relief.

1. Plaintiff seeks an order affirming the final determination of the statute of limitations as two years; and

2. Plaintiff seeks an order reversing the Decision otherwise in its entirety; and

3. Plaintiff requests that the Court enter judgment in favor of the District and order that the District recover its costs and disbursements, together with whatever other relief this Court deems just and equitable.

4. In the alternative, Plaintiff seeks an order reducing the amount of compensatory education owed to the Student to properly reflect a two year statute of limitations or remanding this matter to the Chief ALJ or her designee to determine the appropriate amount of compensatory education.

5. The Plaintiff seeks an order that the Student has received a FAPE during a 4.25 hour school day.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: 6/21/2021

*s/ Laura Tubbs Booth*
Laura Tubbs Booth, #186910
730 2nd Ave. S., Suite 300
Minneapolis, MN 55402
(612) 339-0060
ltb@ratwiklaw.com
***Attorneys for Plaintiff***