# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

OSSEO AREA SCHOOLS,
INDEPENDENT SCHOOL
DISTRICT NO. 279,

          Plaintiff,

v.

          **MEMORANDUM AND ORDER**
          Civil File No. 21-1453 (MJD/DTS)

A.J.T., by and through her
parents, A.T. and G.T.,

          Defendant.

Christian R. Shafer, Elizabeth M. Meske, and Laura Tubbs Booth, Ratwik, Roszak
& Maloney, PA, Counsel for Osseo Area Schools, Independent School District
No. 279.

Amy J. Goetz, School Law Center, LLC, Counsel for A.J.T.

## I.   INTRODUCTION

Defendant AJT is a teenage girl with a severe form of epilepsy called

Lennox-Gastaut Syndrome.  As a result of her disability, AJT has the intellectual

capacity of an 18-month-old child and has seizures continually throughout the

day.  Her seizures are so severe early in the day that she is unable to attend

school in the morning.  Since moving to Plaintiff Osseo School District in 2015,

AJT and the District have agreed that she is unable to begin school until noon

due to her medical condition but have been unable to reach consensus regarding

when her school day should end.

In 2021, an administrative law judge ruled in favor of AJT and ordered the

District to provide AJT with "instruction at home that includes discrete trial

training interventions between 4:30 p.m. and 6:00 p.m. each school day," among

other things.  The District appealed that decision to this Court.   Both parties

have now filed motions for Judgment on the Record.  (Doc. 43 (Defendant AJT's

Motion for Judgment on the Record)); (Doc. 46 (Plaintiff Osseo Area School's

Motion for Judgment on the Administrative Record).)  The Court heard oral

argument via Zoom on July 13, 2022.

As discussed in detail below, the evidence in the record supports the ALJ's

conclusion that "whenever there was a conflict between the need to maintain the

regular hours of the school's faculty, and [AJT's] need for instruction, the regular

hours of the faculty was always the prevailing and paramount consideration."

The correct standard is whether AJT's IEP established an educational program

that was "appropriately ambitious in light of her circumstances."  <u>Endrew F. ex</u>

rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 1000-01(2017).

Without more than 4.25 hours of schooling a day, the IEP did not establish such a

program.  AJT's de minimis educational progress since moving to the District

does not change that fact, especially in light of her regression in certain areas and

the fact that certain historical goals had to be cut from her IEP due to the

shortened school day.  In addition, the District's shifting reasons for denying the

in-home instruction AJT seeks to make up for the morning hours she is not in

school were never based on AJT's needs.  Accordingly, AJT's Motion for

Judgment on the Record is granted and the District's Motion is denied.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The District

Defendant AJT lives with her parents, AT and GT, within the boundaries

of Plaintiff Osseo Area Public Schools, Independent School District No. 279 ("the

District").  AJT has attended public schools in the District since fall 2015 when

her family moved from Boone County, Kentucky to Minnesota.  (Doc. 15 at 973

(ALJ Order, Facts ¶ 24).)  AJT was in fourth grade at the time she entered the

District.  (Doc. 14-15 at 36 (Sept. 21, 2015 IEP).)

### 2.   AJT

At the time of the administrative hearing in February 2021, Defendant AJT was a 15-year-old girl with Lennox-Gastaut Syndrome ("LGS"), a severe form of epilepsy that causes AJT to have seizures continually throughout the day.  (Doc. 14-11 at 53 (Breningstall Hr'g Test. at 255); Doc. 15 at 200 (Wills H'rg Test. at 534), 970 (ALJ Order, Facts ¶ 1).) Her seizure activity is especially severe throughout the night and in the morning.  (Doc. 14-15 at 392 (Kohlhepp Aff. ¶ 10), 463.)  Due to LGS, AJT has significant cognitive disability and functions in the range of an 18-month-old child.   (Doc. 15 at 785 (Shams H'rg Test. at 954).)  She does not speak verbally and uses adapted signs somewhat inconsistently.  (Doc. 14-15 at 248-79 (Ex. 133).)  She requires assistance for walking, balance, and toileting.  (Id.)

Dr. Galen Breningstall, AJT's treating neurologist, testified at the administrative hearing that AJT had a significant cognitive disability caused by LGS.  (Doc. 14-11 at 59 (Breningstall H'rg Test. at 279); Doc. 15 at 784-85 (Shams H'rg Test. at 947-54).)  Individuals with LGS often plateau in their functional and intellectual gains by middle school.  (Doc. 15 at 239 (West H'rg Test. at 689); 785 (Shams H'rg Test. at 953).)  AJT's constant seizure activity has impacted her

cognitive ability and development.  (See, e.g., id. at 200 (Wills H'rg Test. at 534);

(West H'rg Test. at 688); 785 (Shams H'rg Test. at 952-53).)

Dr. Karen Wills, the District's expert and a pediatric neuropsychologist

who has evaluated over 500 children with profound intellectual disabilities, at

least two hundred of whom have seizure disorders, and who has participated in

developing educational programming for more than 7000 students, testified:

> Well, [AJT] is actively having seizures all day every day.  And it is
> clear from the description of [AJT] herself as an individual that that
> ongoing seizure activity interferes greatly with memory, with
> attention and with new learning and also her mood, and for most
> people, just overall alertness.

(Id. at 200 (Wills H'rg Test. at 534); see also Doc. 14-15 at 386 (Wills Aff. ¶ 6).)

> At school, AJT is

> working to pick up objects and release her grasp on command
> (putting things into containers), to use a crayon to mark a single
> stroke on paper, to comply with single word commands about
> physical actions (e.g., to sit or stand), to demonstrate intention and a
> sense of purpose (e.g., protesting or demanding an activity), and to
> anticipate events based on the social context (e.g., raising her arms to
> be dressed).

(Doc. 14-15 at 386 (Wills Aff. ¶ 9.)

> She is just beginning to learn how to imitate others, to take turns in
> reciprocal interaction (such as tossing a ball back and forth), to share
> joint attention (looking at or listening to something when another
> person calls attention to it), and to initiate social contact or

purposeful object-manipulation (exploring things on her own, rather than following the commands and prompts of adults).

(Id.)

### 3.    Services Provided in Kentucky

According to AJT's father, while a student in Kentucky, AJT received instruction from the public school from noon until 6:00 p.m. each day.  (Doc. 14-5 at 103 (AT H'rg Test. at 32-33).)  The Kentucky IEP in the record, however, provided that AJT received 125 minutes of special education in school daily and 90 minutes of special education in the home daily, for a total of 215 minutes (3 hours and 35 minutes) of special education instruction per day.  (Doc. 14-15 at 27 (Mar. 12, 2015, Boone County, KY, IEP).)  AJT's father asserts that this Kentucky IEP in the record was inaccurate.  (Doc. 14-6 at 10-12 (AT H'rg Test. at 80-82).)  AJT alleges that the inaccuracy was not discovered until the administrative hearing and she was unable to obtain the corrected documents from Kentucky.  (Id.; (Doc. 14-7 at 37-38 (AT H'rg Test. at 206-07).)

Kentucky behavior therapist Marygrace Ott, MA, BCBA[1], LBA[2], and independent evaluator and AJT's expert, Dr. Joe Reichle, Ph.D., testified that

---

[1] Board Certified Behavior Analyst
[2] Licensed Behavior Analyst

between 4:00 and 6:00 p.m., AJT had good stamina, was alert and engaged, was on task, was responsive, worked easily without breaks for an hour, and was easily reinforced.  (Doc. 14-11 at 69-70 (Ott H'rg Test. at 319-21, 325-26); Doc. 14-12 at 17, 21 (Reichle H'rg Test. at 440-41, 456); see also (Docs. 14-5 at 140-41 & 14-6 at 1-2 (AT H'rg Test. at 69-72) (AJT's father's testimony opining that AJT did well during Dr. Reichle's three-week trials in the late afternoon).)  Dr. Breningstall testified that AJT would benefit from instruction between 4:15 p.m. and 6:00 p.m. "[b]ecause that is the time of day that is her best time for functioning," and it would provide "more opportunities for the instruction that was delivered at that time to be beneficial to her."  (Doc. 14-11 at 61 (Breningstall H'rg Test. at 288-89).)

### 4.    AJT's Unavailability for Instruction Before Noon

AJT is "unavailable for school before noon each day."  (Doc. 15 at 970 (ALJ Order, Facts ¶ 1).)  Since AJT moved to the District in 2015, the District has excused AJT's absence from school before noon.  (Id. ¶ 2.)

AJT's seizure activity is highest before noon.  (Id. at 971 (ALJ Order, Facts ¶ 10); Doc. 14-15 at 97-102 (AT H'rg Test. 26-31).)  During heavy seizure activity, she cries, is afraid, needs to be comforted, and may be in pain.  (Doc. 14-6 at 38-39 (AT H'rg Test. at 108-09).)  Dr. Breningstall testified that starting AJT's school

day before noon would lead to an "inevitable worsening of her problem.  And I can't see on an experimental basis or otherwise exposing her to an inevitable worsening of her problems." (Doc. 14-11 at 57 (Breningstall H'rg Test. at 273-74).) No medical provider has ever recommended changing AJT's schedule or experimenting with an earlier school start time.  (Doc. 14-6 at 39 (AT H'rg Test. at 109).)

### 5. Scheduled School Day in the District

Dr. Karen Wills, a pediatric neuropsychologist and the District's expert on assessment and interventions, testified that a typical school day for any child is "anything but back-to-back instructional programming.  Part of the school day includes things like lunch time, break time, recess and all of that kind of stuff. . . . [T]o sort of think about the entire day as involving direct instructional programming just isn't accurate." (Doc. 15 at 197-98 (Wills H'rg Test. at 523-24).) AJT is at school for 4 hours and 15 minutes each day receiving intensive special education services and always has one or two adults working solely with her providing services and working on AJT's goals.  (Doc. 15 at 389, 404 (H'rg Test. of Joy Frederickson, former District special education site administrator, at 777-78, 793); 976 (ALJ Order, Facts ¶¶ 55-56); 802 (Elliott H'rg Test. at 1019-20).)

8

The District provided extended school year ("ESY") services to AJT in the amount of 16 3-hours sessions in AJT's home by a licensed special education teacher between the hours of 12:00 p.m. and 3:00 p.m. during the summers she was enrolled in elementary school. (Doc. 15 at 558, 568-69 (Fredrickson H'rg Test. at 727, 770-71).) The District typically provides ESY services for students with special needs at school in the morning and ends services at noon. (Id. at 569 (Frederickson H'rg Test. at 771).) The District offered to provide additional ESY services beyond the typical ESY in June and August; however, AJT's parents rejected this offer because June and August were times that AJT might try new medications and treatments and receive outside therapies. (Id. at 559 (Frederickson H'rg Test. at 731).)

### 6.    Negotiations Between AJT's Parents and the District

AJT's father asserts that before the family moved from Kentucky to Minnesota, he received assurances from the District that the District would continue her modified schedule as it was in Kentucky. (Doc. 14-5 at 92 (AT H'rg Test. at 21).) AJT's father claims that his request was based on undisputed medical and educational opinions that AJT is best able to be alert and active and

seizure-free between noon and 6:00 or 7:00 p.m.  (Doc. 14-6 at 31-33 (AT H'rg Test. at 101-03).)

When AJT entered the District in October 2015, her parents requested that AJT not attend school until noon due to her morning seizure activity.  (Doc. 14-15 at 392 (Kohlhepp Aff. ¶ 10).)  The IEP team, including AJT's parents, agreed that starting the school day at noon was appropriate given AJT's individual needs. (Id. at 464 (Oct. 16, 2015 Prior Written Notice ("PWN") stating that AJT "can not [sic] come to school in the morning due to her seizure activity through the night and in the morning").)

AJT's IEP team first met on September 21, 2015.  (Id. at 46 (Sept. 21, 2015, IEP Meeting Summary).)  The District proposed an IEP that generally accepted the goals and objectives on AJT's most recent IEP from Kentucky.  (Id. at 20 (Mar. 12, 2015, Boone County, Kentucky, IEP); 36 (Sept. 21, 2015, IEP); Doc. 15 at 553 (Frederickson H'rg Test. at 708).) AJT's parents requested two more IEP meetings, which were held on October 14 and October 20, 2015.  (Doc. 14-18 at 8-12).)  Following those meetings, the District proposed an IEP that accepted the goals and objectives on AJT's Kentucky IEP and included minutes of special education service that were commensurate with those on the Kentucky IEP.

10

(Doc. 15 at 553-54 (Frederickson H'rg Test. at 708, 712).)  The Kentucky IEP called for 125 minutes of special education in school daily and 90 minutes of special education in the home daily, for a total of 215 minutes of special education instruction per day.  (Doc. 14-15 at 27.)  The District's IEP included 240 minutes of direct special education daily and 20 minutes weekly of direct speech services. (Id. at 56.)

AJT's parents also requested that AJT receive paraprofessional support in her home from 4:00 p.m. to 6:00 p.m.  (Id. at 464 (Oct. 16, 2015 PWC).)  AJT's parents told the District staff that in Kentucky, AJT received paraprofessional support from her school district three days per week for 90 minutes at home. (Doc. 15 at 553 (Frederickson H'rg Test. at 708).)  In addition, AJT's parents told the District that AJT also received services two days a week after school at home in the evenings all year long, including summers, from the State of Kentucky via a Medicaid waiver program.  (Doc. 14-11 at 68-69 (Ott H'rg Test. at 316-20) (testifying that she worked with AJT from 4:00 p.m. to 6:00 p.m. two days a week and that while her report indicated that AJT attended school from 1:00 p.m. to 3:30 p.m., that was incorrect).)

At the October 14, 2015, IEP team meeting, AJT's father asked if the

District would, "Provide support in the evening," and the District's special

education coordinator stated, "We don't provide both homebound and school

support (modified)."  (Doc. 14-13 at 15 (Oct. 14, 2015, IEP Team Meeting Notes).)

Two days later, on October 16, 2015, based upon that same meeting, the District

issued a Prior Written Notice ("PWN") that stated:

> The team discussed a modified schedule to [AJT's] school day.
> [AJT] can not come to school in the morning due to her seizure
> activity through the night and in the morning.  Mom and Dad have
> requested a modified schedule to further her education into the
> evening when her physical health is appropriate for learning.  The
> district has denied this request saying state law does not mandate
> this support from the school district.

(Doc. 14-15 at 464.)

AJT's parents did not sign the PWN consenting to or objecting to the IEP

within 14 days; thus, as stated in the PWN, the District went forward with the

IEP as proposed.  (Id. at 468.)  On October 20, 2015, AJT's parents provided a

letter to the District stating that "the District has not scheduled sufficient IEP

team meetings to discuss appropriate accommodations from an education and

safety perspective and/or engage[d] in the interactive process" to meet her needs.

(Doc. 14-13 at 16.)  Also in the letter, AJT's parents consented to the proposed

IEP.  (Id.)  AJT began attending Cedar Island Elementary School ("Cedar Island")

under that agreement.  The typical school day at Cedar Island was from 9:30 a.m.

to 4:00 p.m.  (Doc. 15 at 552 (Frederickson H'rg Test. at 705).)  AJT was scheduled

to attend from noon to 4:00 p.m.; however, her mother initially picked her up

from school at 3:30 p.m. due to concerns about AJT's safety being dismissed at

the same time as other students.  (Id. at 552-53 (Frederickson H'rg Test. at 705-

06).)

On March 18, 2016, the District sent AJT's parents a PWN addressing AJT's

school day schedule.  (Doc. 14-15 at 476; Doc. 14-16 at 1-2 (Continuation of Mar.

18, 2016, PWN).)  In that PWN, the District refused AJT's parents' request for

weekly instruction in their home beyond the end of the typical school day;

however, it proposed elongating AJT's modified school day from an end time of

4:00 p.m. to 4:15 p.m.  (Doc. 14-15 at 476.)  This offer was made in part to address

AJT's parents' concerns about AJT navigating the hallways at the end of the

school day.  (Id.; Doc. 15 at 552-53 (Frederickson H'rg Test. at 705-06).)  Under

this proposal, AJT would continue to receive services from her teacher in a one-

to-one setting.  (Doc. 14-15 at 476; Doc. 14-16 at 1-2.)  This offer was rejected by

AJT's parents.  AJT's parents and the District attended conciliation conference

meetings in late May and early June 2016 to discuss, in part, AJT's school day.

(Doc. 14-13 at 42-43.)  Following the conciliation conferences, the District again

proposed trialing an extension of AJT's school day beyond the end of the regular

school day to 4:15 p.m.  (Id. at 44-45 (June 7, 2016, Summary of Conciliation

Conference).)

On June 6, 2016, the District issued a PWN that stated:

The district discussed an extended school day and decided against it
due to the precedent it would start.  For [sic] Osseo School District
and other districts across the area.

(Doc. 14-16 at 3.)  The District and AJT's parents continued to meet and discuss

AJT's IEP.  (See, e.g., id. at 6.)

On April 24, 2017, the District proposed an PWN reflecting a 4.25-hour

school day.  (Doc. 14-16 at 7-8.)  AJT's parents did not return the PWN within 14

calendar days to object to the proposed IEP so the IEP went into effect with the

implied consent of AJT's parents.  (Id. (mark in checkbox for "implied consent—

14 days elapsed"); Doc. 15 at 554 (Frederickson H'rg Test. at 713).)  The April 24,

2017 IEP became the last agreed-upon IEP between the District and AJT's

parents.  This is known as the "stay put" IEP, meaning that during the pendency

of any dispute between a parent and school district, the student remains in the

then-current educational placement as outlined in that IEP.  See 20 U.S.C. §
1415(j).

AJT was retained at Cedar Island for an extra year at the request of her
parents before matriculating to Maple Grove Middle School ("MGMS").  (Doc.
14-7 at 16-17 (AT H'rg Test. at 185-86).)

On April 2, 2018, in preparation for AJT's transition from Cedar Island to
MGMS, the parties discussed AJT's school day in middle school.  MGMS's
typical school day ends at 2:40 p.m., and the District suggested extending AJT's
day to 3:00 p.m.  (Doc. 14-16 at 9-11 (Apr. 2, 2018 PWN).)  AJT's parents rejected
the District's proposal.  (Id. at 11.)  In response to the District's proposal, AJT's
parents proposed "hours of instruction similar to those currently provided [at
Cedar Island] (12:00 – 4:15PM)."  (Doc. 14-13 at 86.)  The District continued to
provide instruction to AJT from noon to 4:15 p.m. under her stay-put IEP.

Each year, AJT's parents have provided the District with a brief letter from
AJT's treating neurologist requesting that she be "exempted from school
attendance before noon" in order to manage her seizure activity.  (See, e.g., id. at
153.)  The District made repeated offers to serve AJT whenever she is available

15

during the regular school day, including before 12:00 p.m. on any days when AJT might be available to be in school earlier in the day.  (See, e.g., Doc. 14-16 at 16.)

### 7.   AJT's Progress in the District

AJT's father testified that AJT had regressed since she lived in Kentucky because she had lost the ability to use a handful of modified hand signs to communicate and had regressed from 50% proficiency using the toilet after her parents agreed to have the goal of "toileting" removed from her IEP as it was taking up too much instructional time.  (See, e.g., Doc. 14-5 at 106-09 (AT H'rg Test. at 35-38).)

Dr. Wills testified that in her review of AJT's education record, AJT had plateaued with regard to her "expressive communication," but she had "not seen any skill where [AJT] regressed."  (Doc. 15 at 206 (Wills H'rg Test. at 557).)  Dr. Wills testified that she looked for evidence in the record that AJT's communication skills had regressed over the five years she had been attending school in the District and that she "did not see any evidence of any regression at all."  (Id. (Wills H'rg Test. at 518).)  Dr. Wills noted that this lack of regression of skills "is really encouraging" and that "given the severity and frequency of [AJT's] seizure disorder, she very well could have, might have regressed."  (Id.)

16

### a)      Progress at Cedar Island

Pam Kohlhepp, AJT's special education teacher at Cedar Island, testified that AJT made progress in her communication ability in the three years that she attended Cedar Island.  (Doc. 15 at 583-84 (Kohlhepp H'rg Test. at 829-30).) Kohlhepp specifically testified that "[AJT] made a lot of gains in terms of her desire to communicate" and her intent to communicate.  (Id. (Kohlhepp H'rg Test. at 830).)  AJT also made progress in using eye gaze as a way to answer questions or select choices.  (Id. at 596 (West H'rg Test. at 882).)  Kohlhepp noted that AJT "made a good deal of progress" with respect to making choices and answering questions using eye gaze.  (Id. at 583 (Kohlhepp H'rg Test. at 830).)

Kohlhepp also testified that AJT made progress on her functional skills while she was a student at Cedar Island.  (Id.)  According to Kohlhepp, AJT's "ability to feed herself increased a great deal."  (Id.)  Kohlhepp also testified that AJT experienced periods of progression and periods of waning in her ability to use modified signs as a means of communication and that AJT continued to use the main signs that she consistently used when she started at Cedar Island, which were "eat" and "treat."  (Id. at 584 (Kohlhepp H'rg Test. at 831).)

Former District Special Education Site Administrator Joy Fredrickson testified that data on AJT's progress was shared at each of AJT's IEP team meetings while she was at Cedar Island.  (Id. at 556 (Frederickson H'rg Test. at 720).)  She testified that AJT's parents "were complimentary of the staff and personnel working with [AJT]" while she attended Cedar Island.  (Id. at 555 (Frederickson H'rg Test. at 718).)

### b)    Progress at Maple Grove Middle School

Dr. Wills stated that recent reports from MGMS did not show regression but rather showed "a distinct improvement."  (Doc. 15 at 196 (Wills H'rg Test. at 519).)  In particular, AJT is improving in the following areas:

> Visual tracking of objects and people in the room, the looking at people's faces, smiling and laughing in response to what's going on around her, initiating and sustaining some turn taking play, like throwing a ball back and forth, really sometimes aiming, which is pitching a ball into, like, a basket or bucket, the eye gaze selection attending and looking at pictures that are pointed out to her, being able to respond relatively quickly to commands like sit down, stand up, just very basic instructions, using the signs that she has consistently and with diminished prompting with less of a need for kind of the hand-over-hand reminders for the eat and drink and treat that she uses pretty predictably.

(Id. at 196-97 (Wills H'rg Test. at 519-20).)

District expert and special educator and consultant Deb West testified that based on her review of AJT's records, AJT made progress with regard to numerous short-term objectives as reported in AJT's IEP Progress Report dated March 9, 2020.  (Id. at 608-09 (West H'rg Test. at 930-32).)  She opined that, while the data collection in elementary school may have included more anecdotal information, the information collected by MGMS was "rich in data" from which to calculate progress.  (Id. at 609 (West H'rg Test. at 932).)

Teresa Elliot, AJT's case manager at MGMS, testified that AJT "absolutely" made progress during the 2019-2020 school year with respect to her IEP goal of increasing her ability to use direct selection for communication.  (Id. at 797 (Elliot H'rg Test. at 1000-02).)  Elliot testified that AJT made progress with regard to choosing with whom she wanted to do an activity or work.  (Id.)  AJT also made progress communicating choices such as whether she wanted a bite of avocado or a bite of something else.  (Id. (Elliot H'rg Test. at 999-1000).)  AJT made progress gaining adult attention.  (Id. at 797-98 (Elliot H'rg Test. at 1002-03).)  Elliot also testified that AJT made progress on objectives related to her IEP goal of improving her skills in activities of daily living.  (Id. at 798 (Elliot H'rg Test. at Tr. 1004-05).)  Elliot testified that, among other things, AJT made progress with

regard to handwashing.  (Id. (Elliot H'rg Test. at 1005-06).)  Elliot also testified

that AJT made progress on her literacy and math goals.  (Id. at 799 (Elliot H'rg

Test. at 1007-1010).)  She did not, however, make any progress with regard to

using the toilet.  (Id. at 798 (Elliot H'rg Test. at 1004-06).)

### c)      Dr. Joe Reichle's Trial Tests

In 2019, the parties agreed that Dr. Joe Reichle would conduct an

independent educational evaluation ("IEE") of AJT.  (Doc. 15 (ALJ Order) at 970-

71).)  Dr. Reichle conducted his evaluation sometime that year.  Among Dr.

Reichle's recommendations in his May 28, 2019 IEE Report were access to "voice

output devices" and as much instruction time as possible "during [AJT's] alert

hours," which optimally are "between approximately noon and 6:00 p.m."  (Doc.

14-15 at 201, 246, 278.)

In autumn 2020, AJT's parents hired Dr. Reichle to conduct a "series of

discrete trial tests and to assess how interventions in the mid and late afternoons

might impact [AJT's] learning."  (Doc. 15 at 979 (ALJ Order, Facts ¶ 73).)  Dr.

Reichel's evaluation consisted of performing ten discrete trials of late afternoon

instruction from 4:15 to 5:30 p.m. in AJT's home, which he compared to

instruction that had been conducted in AJT's home from noon to 1:15 p.m.

(Doc.14-12 at 20 (Reichel Hr'g Test. at 453-54).)  Coaching was provided via telehealth and the paraprofessional implementing the strategies with AJT was the paraprofessional who usually works with AJT and her family.  (Id. (Reichel Hr'g Test. at 454).)  Trials were performed twice-to-three-times-per-week for approximately three and one-half weeks.  (Id. at 20-21 (Reichel Hr'g Test. at 453-54, 458).)

AJT made gains on skills she was learning in school during the trials.  (Id. at 21 (Reichel Hr'g Test. at 458 ("[I]t was fairly impressive how quickly she gained skill in a reasonably short period of time."); 25 (Reichel H'rg Test. at 472 ("My data suggests that not only can she be available and that she can participate, but she can also learn during a period of time in our trial up through 5:30 p.m., because that's as long as we ran the trial in any given day.").)   He testified that there was nothing in his two evaluations of AJT that would support a conclusion that she needs less than a full day of school and that he thought she could benefit from a full day of school.  (Id. at 24 (Reichel Hr'g Test. at 468).)  However, he admitted that he found it "difficult" to opine on her progress because "of the quality of the data" available to him;  in particular, the Cedar Island data consisted of more "anecdotal reports that are somewhat spotty."  (Id.

at 25 (Reichel H'rg Test. at 473).)   Dr. Wills testified that the behavioral

observations collected at Cedar Island are data and that there is a very extensive

description of AJT's functioning over the years and "quite good data . . . over

time to indicate there's learning and teaching going on."  (Doc. 15 at 204 (Wills

H'rg Test. at 550)).)

On October 31, 2020, Dr. Breningstall sent a letter to the District stating

that AJT's school day could not begin before noon due to her morning seizure

activity.  (Doc. 14-13 at 154.)   The letter also stated that "[i]t is also important that

[AJT] receive a minimum of six hours of school attendance to help with her

communication and interaction."  (Id.)

### 8.    Administrative Hearing

On September 14, 2020, AJT's parents filed a special education complaint

and request for a due process hearing against the District with the State of

Minnesota Office of Administrative Hearings, alleging that the District had

violated the Individuals with Disabilities Education Act ("IDEA") because AJT

did not receive six-and-a-half hours of education per day like her non-disabled

peers and asserting that the District should provide education to AJT from noon

until 6:30 p.m. each day.  (Doc. 14 at 5-10.)  Administrative Law Judge Eric L.

Lipman ("the ALJ") presided over the case.  (Id. at 19, 28.)

A five-day hearing occurred before the ALJ in February 2021.  (Doc. 15 at

969 (ALJ Order at 1).)  On April 21, 2021, the ALJ issued his decision ("ALJ

Order").  The ALJ ruled:

> The Student established that an educational program which did not
> include supplemental instruction [at] home in the afternoon, did not
> afford her a free appropriate public education (FAPE).  The Student
> likewise established that 495 hours of such instruction would fairly
> remediate the School District's denial of a FAPE.

(Id.)

The ALJ ordered the District to revise AJT's IEP to include the following

additions:

(a)     instruction at home that includes discrete trial training
        interventions between 4:30 p.m. and 6:00 p.m. each school
        day;

(b)     compilation and review of the discreet trial training
        intervention data;

(c)     direct and indirect services of a Speech and Language
        Pathologist to design, deliver and monitor the implementation
        of a communication intervention program; and

(d)     the provision of eye gaze technology with a speech generating
        device to effectively augment her communication capacities.

(<u>Id.</u> at 987 (ALJ Order, Conclusions ¶ 15).)

Other facts will be discussed as necessary.

## B.     Procedural History

### 1.     Appeal Case

On June 21, 2021, the District filed the instant case against AJT in this

Court asserting an appeal of the ALJ's decision under 20 U.S.C. § 1415(i)(2).  Civil

File No. 21-1453 (MJD/DTS).

### 2.     Related Discrimination Case

On August 3, 2021, AJT, through her parents, filed a Complaint against the

District and the Osseo School Board.  Civil File No. 21-1760 (MJD/DTS).  On

November 8, 2021, AJT filed an Amended Complaint against the District and the

Osseo School Board alleging: Count 1: Violations of the IDEA; Count 2:

Violations of § 504 of the Rehabilitation Act of 1973; and Count 3: Violations of

the Americans with Disabilities Act.  (Doc. 15.)  All three claims are based on the

District's failure to provide AJT a six-and-a-half-hour school day starting at

noon. That case was transferred to Judge Davis as a related case.  On July 29,

2022, the District filed a motion for summary judgment in the discrimination

case.  On August 18, 2022, AJT filed her opposition to the District's motion.

### C.    Current Motions

The parties have now filed cross motions for judgment on the record in the

appeal case.

## III.    DISCUSSION

### A.    Standard of Review Under the IDEA

The Individuals with Disabilities Education Act (IDEA or Act) offers
States federal funds to assist in educating children with disabilities.
In exchange for the funds, a State pledges to comply with a number
of statutory conditions.  Among them, the State must provide a free
appropriate public education—a FAPE, for short—to all eligible
children.

Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 993

(2017) (citations omitted).

"A State covered by the IDEA must provide a disabled child with such

special education and related services in conformity with the child's

individualized education program, or IEP."  Id. at 994 (cleaned up and citation

omitted).  When evaluating an IEP, "[t]he IDEA looks for improvement, not

mastery."  Minnetonka Pub. Schs., Indep. Sch. Dist. No. 276 v. M.L.K. ex rel. S.K.,

--F.4th--, No. 21-1707, 2022 WL 3009138, at *4 (8th Cir. July 29, 2022).  "To meet its

25

substantive obligation under the IDEA, a school must offer an IEP reasonably

calculated to enable a child to make progress appropriate in light of the child's

circumstances."  Endrew F., 137 S. Ct. at 999.

> The "reasonably calculated" qualification reflects a recognition that
> crafting an appropriate program of education requires a prospective
> judgment by school officials.  The Act contemplates that this fact-
> intensive exercise will be informed not only by the expertise of
> school officials, but also by the input of the child's parents or
> guardians.  Any review of an IEP must appreciate that the question
> is whether the IEP is reasonable, not whether the court regards it as
> ideal.

Id. (emphasis in original) (citations omitted).  However, that child's "educational

program must be appropriately ambitious in light of [her] circumstances.  A

student making 'merely more than de minimis' progress from year to year can

hardly be said to have been offered an education at all."  J.P. ex rel. Ogden v.

Belton Sch. Dist. No. 124, 40 F.4th 887, 890 (8th Cir. 2022) (quoting Endrew F., 137

S. Ct. at 1000-01) (cleaned up).

When parents and a school district disagree regarding the contents of a

child's IEP,

> parents may turn to dispute resolution procedures established by
> the IDEA.  The parties may resolve their differences informally,
> through a "preliminary meeting," or, somewhat more formally,
> through mediation.  If these measures fail to produce accord, the
> parties may proceed to what the Act calls a "due process hearing"

> before a state or local educational agency.  And at the conclusion of
> the administrative process, the losing party may seek redress in state
> or federal court.

Endrew F., 137 S. Ct. at 994 (cleaned up).

> In lawsuits filed under section 1415(i)(2), the district court is
> required to receive the records of the administrative proceedings,
> hear additional evidence at the request of a party, and
> independently determine the appropriate relief based on a
> preponderance of the evidence.

Hansen ex rel. J.H. v. Republic R-III Sch. Dist., 632 F.3d 1024, 1026 (8th Cir. 2011)

(citations omitted).

> In deciding whether the IDEA has been violated, the district court
> must independently determine whether the child in question has
> received a FAPE.  In doing so, the court must also give due weight
> to agency decision-making.  This somewhat unusual standard of
> review is less deferential than the substantial-evidence standard
> commonly applied in federal administrative law.  But we have
> recognized that this limited grant of deference—due weight—is
> appropriate in IDEA cases because the ALJ had an opportunity to
> observe the demeanor of the witnesses and because a district court
> should not substitute its own notions of sound educational policy
> for those of the school authorities that it reviews.

K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 803 (8th Cir. 2011) (cleaned up and

citations omitted).

Although the Court "must give due weight to the factual findings of the administrative panel," the Court "consider[s] the panel's legal conclusions de novo." Hansen, 632 F.3d at 1026.

"While the district court must accord due weight to the administrative panel's decision, the burden of persuasion remains with . . . the party challenging the IEP," in this case, AJT. Lathrop R-II Sch. Dist. v. Gray ex rel. D.G., 611 F.3d 419, 423 (8th Cir. 2010); see also Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief," that is the party who "seek[s] to challenge an IEP").

Here, the District asserts that the ALJ made no credibility determinations and relied on the testimony of each of the witnesses for some part of his decision. Therefore, there is no basis to defer to the ALJ.

## B.    Whether the ALJ Applied the Correct Legal Standard

The District asserts that the ALJ applied the incorrect legal standard when deciding whether the District had provided AJT with a FAPE, because he based his decision on whether AJT might make more progress with more instructional time at home, rather than on the appropriateness of AJT's stay-put IEP.

The District notes that the ALJ made factual findings that AJT made progress during her time at Cedar Island and MGMS in (1) using eye gaze methods to make choices and answer questions; (2) handwashing; (3) using modified signs as a means of communication; (4) using direct selection for communication; (5) choosing with whom she wanted to work or do an activity; (6) communicating choices; and (7) self-initiating handwashing. (Doc. 15 at 977 (ALJ Order, Facts ¶¶ 58, 61).) The District asserts that the ALJ failed to assess whether this progress was appropriate in light of AJT's unique circumstances including a severe seizure disorder and cognitive impairment. Instead, the ALJ merely relied on Dr. Reichle's opinion that AJT would likely make more gains with more instruction. (See id. at 980-81 (Facts ¶¶ 74, 86).)

The District argues that the correct standard to determine whether the District provided a FAPE is whether the IEP was "reasonably calculated to enable [AJT] to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 1001. The District asserts that applying that standard, AJT did receive a FAPE.

The Court finds that the ALJ applied the correct legal standard to AJT's claim. First, the ALJ acknowledged that the burden of proof was on AJT to

demonstrate by a preponderance of the evidence that she did not receive a FAPE. (Doc. 15 at 986 (ALJ Order, Conclusions ¶ 3).)  Second, the ALJ noted that the test was whether AJT's IEP was "reasonably calculated to enable the child to make progress appropriate in light of [her] circumstances."  (Id. at 986-87 (ALJ Order, Conclusions ¶ 9).)  Third, the ALJ held that AJT had established that her educational program was not "appropriately ambitious in light of [her] circumstances," that she did not have "the chance to meet challenging objectives," and that "the opportunity to access hours of afternoon instruction at home—particularly discrete trial opportunities—would be beneficial, meaningful and appropriately challenging to [AJT]."  (Id. at 987 (ALJ Order, Conclusions ¶¶ 10, 12).)

Thus, although the ALJ did find that more instruction would provide more progress, he also found that the current IEP, without the supplemental instruction at home, was not providing an educational program reasonably calculated to enable AJT to make progress appropriate in light of her circumstances.  (Id. at 986 (ALJ Order, Conclusions ¶¶ 6-7).)  Specifically, the ALJ found that whenever there was a conflict between the need to maintain the regular hours and AJT's need for instruction, regular hours was always "the

30

prevailing and paramount consideration" and that AJT's educational

programming was "thus constrained by limitations imposed upon, and outside

of, the IEP Team." (Id.)  This was the wrong priority for the District.  See Ind.

Sch. Dist. No. 623, No. 317-2, 31 IDELR ¶ 17, 53 (holding that a Minnesota school

district's categorical refusal to consider provision of extended day services as

way to meet goals of IEP was procedural violation of IDEA because "[s]uch

services are appropriate in certain circumstances and their location is not

confined to the school day or a school setting"); see also U.S. Dept. of Education

Dec. 22, 2014 Letter to Arcadia Unified School District ("Arcadia") (explaining

that the school violated disabled students' civil rights when it dismissed disabled

students earlier than other students, which denied them the same number of

educational minutes of schooling as non-disabled students without making

individual assessments that early dismissal was "necessary for the needs of

specific students"), available at https://www2.ed.gov/about/offices/list/ocr/docs/

investigations/more/09141322-a.pdf (last visited Aug. 21, 2022); U.S. Dept. of

Education New York Office for Civil Rights May 29, 2015 Letter to Rye City

School District  ("Rye City") (explaining that dismissing certain disabled

students earlier than all other disabled and non-disabled students denied the

students a FAPE when the early dismissal was to avoid congestion during parent

and bus pick-up time and that "[a]dministrative convenience is never an excuse

for impermissibly shortening the instructional time that students with disabilities

receive"), available at https://www2.ed.gov/about/ offices/list/ocr/docs/ 59

investigations/more/02151099-a.pdf (last visited Aug. 21, 2022).

This is the conflict point between the parties.  For the most part, the

District argues that AJT's FAPE should be judged by her progress.  AJT, on the

other hand, asserts that the District cannot provide her a FAPE as long as it does

not provide her a school day that is 6.5 hours-long and that those hours coincide

with the hours when she is medically-able to learn (i.e., when she is less prone to

severe seizure activity and is alert and receptive to learning).

### C.    Whether the IDEA Requires the Presumption of a Full School Day

The District argues that while it has a legal obligation to individualize

AJT's educational programming to meet her needs, it does not have an obligation

to provide the same length school day to her as to non-disabled students.  It

asserts that Minnesota law allows the standard school day to be adapted for

students with disabilities because Minn. Stat. § 120A.22, subd. 12 states that a

child may be "excused from attendance for the whole or any part of the time

school is in session during any school year" based on a "note from a physician or

licensed mental health professional stating that the child cannot attend school."
The District notes that AJT's parents and medical providers opine that she cannot
attend school before noon; therefore, it concludes that AJT's needs dictate her
school day.  Moreover, the ALJ did not order a 6.5-hour "full" school day from
noon until 6:30 p.m.  Instead, the ALJ ordered a 5.75-hour day that ran from noon
until 4:15 p.m. at school and then included home instruction from 4:30 p.m. until
6:00 p.m.

Relying on Endrew F., AJT responds that before a school can provide a
shortened school day, the IEP team must determine that a shortened school day
is "specially designed to meet a child's unique needs."  137 S. Ct. at 999 (cleaned
up) (emphasis in original).  She asserts that there is no evidence that a shortened
school day is required in order to meet her individual needs.  Instead, a
preponderance of the evidence shows that a full school day is necessary for AJT
to learn appropriately.

AJT argues that under 20 U.S.C. § 1401(9)(B), a FAPE is a program of
"special education and related services that . . . meets the standards of the State
educational agency."  Minnesota education standards require every school
district to provide minimum hours of instruction to all students: 935 hours per

year for grades 1-6 and 1020 hours per year for grades 7-12 per Minn. Stat. §

120A.41, subdivision a.  Yet the District has only allocated AJT 765 hours per year

of instruction while other middle school students in the District receive 1170

hours of instruction per year.

AJT asserts that every eligible student with a disability is presumed to be

entitled to a full school day unless their needs dictate otherwise.  See 34 C.F.R. §

300.11(c) ("School day means any day, including a partial day that children are in

attendance at school for instructional purposes.  School day has the same

meaning for all children in school, including children with and without

disabilities.").

AJT concludes that only a student's IEP team's determination that the

individual student requires a shorter school day in order to receive a FAPE can

justify a shorter school day.  (Doc. 54 at 24 n.91 (citing, inter alia, Spring Branch

Ind. Sch. Dist. v. O.W., 938 F.3d 695, 712 (5th Cir. 2019) (holding that shortening a

school day by almost half "was a substantial and significant deviation from the

IEP which indisputably resulted in a loss of academic benefits" and when

accomplished outside of the required IEP Team process violated the IDEA)

opinion withdrawn and superseded on other grounds on reh'g sub nom.

by Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W., 961 F.3d 781 (5th Cir.

2020); Teague Ind. Sch. Dist. v. Todd L., 999 F.2d 127, 129 (5th Cir. 1993) (holding

that shortening student's school day from seven hours to two hours did not

violate the IDEA when reduction was included in the IEP due to the student's

"inability to tolerate a longer school day without becoming unduly frustrated

and discouraged, leading to regression rather than academic progress" and not

for the convenience of school staff)).  AJT concludes that, here, the District

shortened her school day without first employing full-time instruction to

determine the benefits from full-time instruction and without considering AJT's

needs.  Because the District refused to provide instruction after 4:15 p.m., the

only data regarding the benefit to AJT of instruction between 4:00 p.m. and 6:00

p.m. comes from the testimony of her father, her former educator in Kentucky,

and Dr. Reichle, who performed test trials with AJT between 4:15 p.m. and 5:30

p.m.

The Court declines to reach the issue of whether the IDEA requires the

presumption that every student is entitled to a full instruction day regardless of

the start time.  Deciding this issue is not required to decide the motions before

the Court.  Importantly, the ALJ found that AJT had been denied a FAPE without

relying on such a presumption.  Moreover, the Supreme Court's caselaw regarding FAPE provides a flexible standard of whether the IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F., 137 S. Ct. at 999.  The Supreme Court has purposely avoided applying bright-line rules such as a "de minimis" progress standard or a standard that the IEP provides "an opportunity to understand and participate in the classroom that was substantially equal to that given her non-handicapped classmates."  See id. at 1001 (citation omitted).  Additionally, the Supreme Court and Eighth Circuit caselaw is clear that the burden is on the party challenging the IEP – here, AJT – so applying a presumption that the District's IEP is illegal because it provides fewer instructional hours than a typical school day and requiring the District to show that fewer hours are required for AJT flips  that burden.

Additionally, given the evidence that AJT cannot safely start the school day until noon and the lack of evidence that it would be safe for her to receive instruction after 6:00 p.m., the record amply supports the ALJ's decision that AJT's FAPE did not require a full 6.5-hour school day.  Finally, although federal statute defines a FAPE as a program of special education that "meets the

standards of the State educational agency," Minnesota law allows a student to be excluded from attendance based on a note from a physician, and AJT had an annual letter from her physician stating that she was unable to attend school before noon. Therefore, like the ALJ, the Court need not rely on this presumption to determine whether the District provided AJT a FAPE.

### D.   Sufficiency of the Evidence to Support the ALJ'S Decision

#### 1.   Whether the District Prioritized Regular Faculty Hours Over AJT's Needs

The District argues that the ALJ clearly erred by determining that

> whenever there was a conflict between the need to maintain the regular hours of the school's faculty, and the student's need for instruction, the regular hours of the faculty was always the prevailing and paramount consideration.

(Doc. 15 at 986 (ALJ Order, Concl. ¶ 6).)

The District argues that the evidence in the record supports only one conclusion: the District shortened AJT's school day because the IEP team, including AJT's parents, determined that AJT's needs required a noon start time for school. The doctors' letters that AJT's parents provided to the IEP team stated that AJT needed a noon start time, the letters never stated that she should be educated 6.5 hours per day until Dr. Breningstall's October 31, 2020 letter, which stated that she should receive a minimum of six hours of school

attendance to help with her communication and interaction.  And, the District

asserts, Dr. Breningstall's opinion is simply based on information from AJT's

parents.

The District also argues that the uncontroverted evidence showed that AJT

received a shortened school day in Kentucky; the IEP team considered the

Kentucky IEP and adopted most of it and the IEP team agreed to more minutes

of special education services than AJT had received in Kentucky, although she

received them in school rather than at home.  (Doc. 55 at 6-7 (citing Sterling A. ex

rel. Andrews v. Washoe County Sch. Dist., 307-CV-00245-LRH-RJJ, 2008 WL

4865570, at *7 (D. Nev. Nov. 10, 2008) (holding that services offered in the interim

IEP in Nevada were "similar or equivalent" to the home-based services provided

for in the California IEP because "[t]he evidence indicates that while the exact

location of the services was different, the substance and goals of the [] services

was the same").)

The District further argues that AJT's IEP called for a  school day of 4.25

hours during almost the entire time she was enrolled in the District; and, apart

from the brief interim IEP, the District's IEP always called for services after the

end of the regular school day—15 minutes more in elementary school and 95

38

minutes after the end of the middle school day.  Finally, the District notes that in April 2017, AJT's parents agreed to an IEP that required a 4.25-hour school day for middle school and did not object.

The District also argues that AJT only needed a shortened school day because AJT's education consisted of 4 hours and 15 minutes of intensive 1:1 or 2:1 instruction, which provided education comparable to 6.5 hours of a usual school day.  It asserts that AJT's school day schedule does not include down times for recess, elective courses, or eating lunch with peers.  AJT received an intensive program designed based on her unique needs with the sole attention of one adult or, from 2:40 p.m. to 4:15 p.m., two adults delivering instruction to her alone.  (Doc. 15 at 389, 404 (Fredrickson H'rg Test. at 777-78, 793); 802 (Elliott H'rg Test. at 1019-21).)

 Thus, AJT's educators designed her program for the time that she was available when school was in session and for additional time that the full IEP team agreed was necessary beyond the school day.

The District emphasizes that it consistently considered AJT's parents' request for additional hours of instruction beyond the end of the regular school day.  The IDEA's procedural requirements require the District to "consider"

AJT's parents' requests for more educational services by discussing those

requests at an IEP team meeting.  See K.E., 647 F.3d at 805-06.  The District asserts

that it met this obligation, and the fact that AJT's IEP team disagreed with her

parents' requests does not demonstrate a violation of the IDEA.

The Court finds that the ALJ did not err in finding that when there was a

conflict between AJT's need for instruction and the school's regular hours, the

regular hours of the faculty were always the prevailing consideration.  AJT's

parents consistently maintained that AJT needed instruction in the late afternoon

and early evening, she received such instruction under her Kentucky IEP, and

there was no evidence ever submitted to the school that instruction during that

time would be harmful to AJT.  The District steadfastly refused to extend the

instruction hours past 4:15 with a series of shifting reasons: at one point merely

stating, "We don't provide both homebound and school support," then stating

state law did not mandate this type of support, and finally stating that it would

not provide an extended school day "due to the precedent it would start [for the

District] and other districts across the area."  None of these reasons is based on

an individual assessment of AJT's needs as required by the IDEA, under which

extended days "are appropriate in certain circumstances and their location is not

confined to the school day or a school setting." Ind. Sch. Dist. No. 623, 31 IDELR ¶ 17; Endrew F., 137 S. Ct. at 999 ("A focus on the particular child is at the core of the IDEA."). Administrative convenience is not an excuse for impermissibly shortening the instructional time a disabled child receives. Rye City, https:// www2.ed.gov/about/offices/list/ocr/docs/investigations/more/ 02151099-a.pdf; see also Todd L., 999 F.2d at 129 (finding that shortened school day was in response to child's needs not for the convenience of school staff).

There is no evidence that six hours of instruction per day would be harmful to AJT. In fact, there is evidence that six hours of daily instruction is important to AJT's communication and interaction development.

As the ALJ acknowledged, the District provides AJT "intensive services" with one-on-one or two-on-one instruction at all times. (Doc. 15 at 976 (ALJ Order, Facts ¶ 55).) However, there is no evidence that the intensity of the services means that a six-hour school day would not be appropriate and beneficial or that this student-to-teacher ratio is somehow a substitute for hours of instruction. As AJT's father testified, the IEP needed to omit toileting goals because there simply was not time in the 4.25-hour school day to work on that goal along with the other goals in AJT's IEP. Dr. Reichle testified that all of the

interventions that he recommended for AJT in the 2019 independent evaluation

could not be implemented in her shortened school day.  (Doc. 14-12 at 18 (Reichle

H'rg Test. at 444-45).)  Nor is there any evidence that the intensity of AJT's

instruction makes her fatigued or unable to learn for six hours.  Finally, contrary

to the District's assertion, like any child's typical school day, AJT's 4.25-hour day

includes time for lunch, bathroom use, and breaks, although her aides do work

on some learning goals during those times.  (Doc. 14-15 at 323.)  Moreover, the

District admits that AJT receives 1:1 and 2:1 support because she requires it, not

because the District is doing something extraordinary for AJT.  (Doc. 15 at 570

(Fredrickson H'rg Test. at 778).)

Although both parties agree that AJT is unable to start school before noon,

that is not the same as agreeing that AJT has to stop school after 4.25 hours.  The

evidence supports the ALJ's decision that while AJT's medical needs dictated the

start of AJT's school day, the District's preferred schedule dictated the end of

AJT's school day.   No member of AJT's medical team ever suggested that a full

school day would be harmful to AJT or would fail to produce any benefit to her.

(Doc. 14-6 at 37 (AT H'rg Test. at 107).)  The most recent letter from Dr.

Breningstall stated, "It is also important that [AJT] receive a minimum of six

hours of school attendance to help with her communication and interaction."
(Doc. 14-13 at 154.)  In addition, Dr. Reichle testified, "My opinion is it's likely
she would make more gains with additional instruction" and that AJT should
have as much instruction as possible during her alert hours from approximately
12:00 to 6:00 p.m.  (Doc. 14-12 at 25 (Reichle H'rg Test. at 474); see also Doc. 14-15
at 201, 246, 278.)  AJT's parents never agreed that a shortened school day
beginning at noon would be appropriate given her individual needs.

As the ALJ found, the services in AJT's IEPs were limited by the shortened
school day rather than by her needs.  This conclusion is supported by the
testimony of independent educational evaluator Dr. Reichle, that her teacher and
case manager, Teresa Elliot, conceded that to him in discussions.  (Doc. 14-12 at
22 (Reichle H'rg Test. at 461); Doc. 15 at 979 (ALJ Order, Facts ¶ 71)); see also Ind.
Sch. Dist. No. 623, No. 317-2, 31 IDELR ¶ 17, 53 (holding that extended days "are
appropriate in certain circumstances and their location is not confined to the
school day or a school setting"); Arcadia (denial of same number of educational
minutes to disabled students without individual assessments that fewer minutes
or early dismissal was "necessary for the needs of specific students" was denial
of FAPE), available at https://www2.ed.gov/about/offices/list/ocr/docs/

43

investigations/more/09141322-a.pdf; Rye City ("Administrative convenience is

never an excuse for impermissibly shortening the instructional time that students

with disabilities receive"), available at https://www2.ed.gov/about/offices/list/

ocr/docs/investigations/more/02151099-a.pdf.

## 2.    Instruction in the Late Afternoon and Evening

The District asserts that the ALJ's remedy that AJT receive services until

6:00 p.m. is contrary to the evidence presented by the District about AJT's needs

and also contrary to the evidence introduced by AJT's experts.  Because the ALJ's

Order is based on something other than the record created at the hearing, the

District argues it must be overturned.

The District points out that the ALJ determined that education after 6:00

p.m. would be risky for AJT.  (Doc. 15 at 985 (ALJ Order, Facts ¶ 111).)  Yet no

witness opined services between 6:00 p.m. and 6:30 p.m. would be dangerous for

AJT.  Dr. Reichle testified that nothing in his evaluations supported a conclusion

that AJT could not attend schooling until  6:30 p.m.  (Docket No. 14-12 at 25

(Reichle H'rg Test. at 472-474).)

The District emphasizes that "[t]he fact that the IDEA is a federal statute

does not mean that every state must administer the act in the same way."  J.B. ex

rel. B.B. v. Lake Washington Sch. Dist., No. C12-0574RSL, 2013 WL 195375, at *2

(W.D. Wash. Jan. 17, 2013).  Thus, according to the District, the services provided

by Kentucky are not the standard for measuring whether AJT received a FAPE in

the District.  See id.

AJT responds that although Dr. Reichle did no trials between 5:30 and 6:00

p.m., evidence from Kentucky and AJT's parents shows that effective educational

results can be achieved after 5:30 p.m.

### a)  Instruction Between 5:30 and 6:00 p.m.

The ALJ's decision that instruction between 5:30 and 6:00 p.m. would be

beneficial to AJT is well supported.  Although Dr. Reichle's trial experiments

only lasted until 5:30 p.m., Behavior Specialist Ott testified that AJT was able to

learn until 6:00 p.m. when she received instruction in Kentucky, and AJT's father

testified that she was alert and available to learn at that time.  Dr. Breningstall

also testified that AJT would benefit from instruction between 4:15 and 6:00 p.m.

There is no evidence to contradict that testimony.  Additionally, the ALJ's

determination that the District was not required to provide instruction after 6:00

p.m. was reasonable and well-supported because there is no evidence that

instruction after 6:00 p.m. would be beneficial or safe.  No instruction or test

trials ever occurred at that time and no medical provider testified that instruction

at that time would be beneficial or safe.

### b) Whether AJT Would Have Made More Progress with Additional Instruction until 6:00 p.m.

The record supports the finding that AJT would have made more progress

with additional instruction from 4:15 to 6:00 p.m. and there is no evidence that

she would not have made additional progress with those extended hours.  Dr.

Reichle testified that AJT was not as efficient a learner as a typical learner,

needed additional time, was a hard and motivated worker who was easy to

motivate to pay attention and learn during those times, and "would have made

additional gains" with additional instruction.  (Doc. 15 at 979 (ALJ Order, Facts

¶¶ 72, 74 (citing Doc. No. 14-12 at 18, 25 (H'rg Tr. at 443, 474 (Reichle Test.)).)

Every witness to testify on the subject testified that AJT does not learn as

efficiently as a typical learner.  Dr. Reichle testified that three hours of instruction

for AJT is not the same as three hours of instruction for a typical learner, and that

"she could definitely benefit from more instruction than she has received." (Doc.

14-12 at 25 (Reichle H'rg Test. at 473).)  He opined:

> [AJT] can use all the time she can get to learn.  She is clearly – and I
> don't think anybody can dispute she is clearly way behind in terms
> of learning communication skills and she's falling further behind
> every day in terms of rate of acquisition.  So she can use all the

> available hours that she can get where she's motivated to learn. That's in terms of what would be best for her.

(Id. at 18 (Reichle H'rg Test. at 444).)  Dr. Reichle explained that all of the interventions that he recommended for AJT in 2019 had not been implemented and full implementation would require more time than a regular school day.  (Id. (Reichle H'rg Test. at 445).)  He opined that literature in the field regarding the effects of intensity of instruction for learners with intellectual disabilities generally suggests "that higher dosages result in quicker acquisition."  (Id. at 23 (Reichle H'rg Test. at 464).)  In 2019, Dr. Reichle recommended that AJT receive a full day of school.

> In conducting this IEE, it quickly became clear that optimal times to work with [AJT] were between approximately noon and 6 p.m. [AJT] frequently experiences seizures during the evenings which requires that she recovers during the following mornings. Consequently, her school hours are not traditional hours.  Given her seizure history [AJT] is likely to experience relatively fewer productive educational hours than most learners.  As a result, it is very important that she receives as much time as possible for instruction during her alert hours.

(Doc. 14-15 at 246.)  Dr. Reichle testified that AJT's learning "trajectory is falling further and further behind her peers."  (Doc. 15 at 229 (Reichle H'rg Test. at 651).)  He testified that additional instruction would result in additional progress.  (Doc.

14-12 at 25 (Reichle Hr'g Test. at 474).)  "[A] full school day in my experience

tops a half school day every time."  (Id. at 24 (Reichle H'rg Test. at 468).)

### 3.    Whether AJT Made Progress in the Shortened School Day

The District argues that the preponderance of the record evidence shows

that AJT made progress on her IEP goals with the shortened school day.  (See

Doc. 15 at 573 (Frederickson H'rg Test. at 789 ("[AJT] was benefiting from the

school day that she had, she was continuing to make progress within the hours

she was provided.")); 599 (Kohlhepp H'rg Test. at 892 (testifying that AJT has

made progress on communication skills but that she did not "see a lot of

progress in her functional skills")).)  Even Dr. Reichle admitted that AJT had

made progress on some skills in school.  (Doc. 14-12 at 25 (Reichle H'rg Test. at

473 ("There are skills at school where she has made gains.")).)

The District asserts that evidence of progress is significant given that it is

not uncommon for individuals with LGS to regress and lose previously-acquired

skills.  (See Doc. 15 at 196 (Wills H'rg Test. at 518 (testifying that "given the

severity and frequency of [AJT's] seizure disorder [] she very well could have,

might have regressed" and "many children do [regress]")); 239 (West H'rg Test.

at 689 (testifying that her experience with two individuals with LGS is that they

48

plateaued, but did not regress, by the time of middle school)); 785 (Shams H'rg

Test. at 952-53 (testifying that most LGS patients plateau after age 8 or 9 and

through the mid-teenage years)).)  Both Dr. Wills and West testified that AJT has

not regressed in a single skill area since enrolling in the District.  (See, e.g., id. at

196 (Wills Hr'g Test. at 518, 556); 599 (West H'rg Test. at 892-93).)

The District notes that evidence of progress is probative of the adequacy of

the IEP, citing Endrew F., 137 S. Ct. at 1001 (holding that the IDEA "requires an

educational program reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances").  The District also reminds the

Court that the IDEA requires neither specific results nor that the District

maximize AJT's potential or "provide the best possible education at public

expense." (Doc. 60 at 1 (quoting M.L.K., 2022 WL 3009138, at *4).)

The Court finds that AJT made progress during the 4.25-hour day.

However, this fact does not require reversal of the ALJ's Order.  First, the

Supreme Court has made clear that the fact that a student makes some progress

in an IEP does not alone establish that the IEP provides a FAPE.  See Endrew F.,

137 S. Ct. at 1000-01 (holding that FAPE "standard is markedly more demanding

than the merely more than de minimis [progress] test" and "requires an

49

educational program reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances") (cleaned up).  Second, while it

is undisputed that AJT did make progress in some areas under the IEP, it is also

undisputed that she regressed in the areas of toilet training, signing, and

initiating greetings with assistive technology.  She lost the capacity to use a

variety of signs that she had used in Kentucky, lost the capacity to void on the

toilet 50% of the time, and lost the capacity to successfully interact with peers by

using assistive technology to initiate or return a greeting.  (Doc. 14-5 at 106-07;

14-6 at 71-72 (AT H'rg Test. at 35-37, 141-42); Doc. 14-15 at 22 (Mar. 12, 2015,

Kentucky IEP ("[AJT] can independently initiate a greeting to a peer or adult or

return a greeting from a peer or adult by activating a prerecorded button switch .

. . .")).)

Dr. Reichle testified that AJT lost skills previously acquired and that

regression suggests that AJT needs more instruction.  (See, e.g., Doc. 14-12 at 10-

11, 24 (Reichle H'rg Test. at 413-15, 470).)  He noted in his IEE that on the day he

observed AJT at school, she did not return the greeting of one of her school peers.

(Doc. 14-15 at 181 ("One female classmate said 'Hi' to [AJT] to which she did not

react. The peer 'hung around' [AJT] for a minute or so telling others that '[AJT]

here' while acting excited.").)  Importantly, Dr. Wills testified that while LGS can

cause a regression in skills, LGS had not yet caused AJT's regressions because

she was still progressing.  (Doc. 15 at 206 (Wills H'rg Test. at 556-57).)

While witnesses testified that LGS can cause plateauing or regression (Doc.

15 at 239 (West H'rg Test. at 689); 785 (Shams H'rg Test. at 952-53)), there is no

definitive evidence that AJT's LGS caused the plateauing and regressing that she

has experienced.  Furthermore, special education teacher Pam Kohlhepp testified

that she could not opine for sure if AJT's learning progress could improve with

more time, that she had no basis to conclude that AJT would be harmed by

instruction between 4:00 and 6:00 p.m., and that she had no reason to believe AJT

could not benefit from a full day of school.  (Id. at 590 (Kohlhepp H'rg Test. at

855).)  Likewise, Dr. Breningstall testified that "it would be beneficial for [AJT] to

have the same number of schooling hours as her peers" and there is no reason to

believe she would be harmed by instruction from noon to 6:00 or 6:30 p.m.  (Doc.

14-11 at 58 (Breningstall H'rg Test. at 275).)  Dr. Wills also testified that "it's kind

of a no-brainer that, of course, instruction is a benefit," particularly for an

individual "with greater needs," although she noted that it is "a different thing

than to say that this is necessary."  (Doc. 15 at 197 (Wills H'rg Test. at 520-21).)

### 4.    Reliability of Dr. Reichle's Opinion

The District argues that Dr. Reichle's opinion that "more is better" and that AJT would likely make more gains with more instruction is not supported.  First, the District notes that his recommendation is based on a short-term intervention over the internet in which he coached a paraprofessional in AJT's home to facilitate discrete trial training sessions that were limited in scope and duration. (Doc. 14-12 at 20 (Reichle H'rg Test. at 454).)  Dr. Reichle wanted to gauge AJT's seizures and alertness, but he could not do either via the computer, testifying only that he could "say there were no large seizures but beyond that I can't say too much."  (Id.)  Likewise, he had only an anecdotal gauge of AJT's alertness based on the fact that "she learned relatively quickly and we had relatively few no responses."  (Id. at 20-21 (Reichle H'rg Test. at 454-55).)

Dr. Reichle also testified that literature regarding the success of more intensive interventions for learners with intellectual disabilities is "a little mixed."  (Id. at 279 (Reichle H'rg Test. at 463-65).)  He admitted that one recent study indicates that less intensity of service may actually be more successful because the learner's attention span wanes in longer sessions.  (Id.)  When asked what the literature indicates with regard to more intensity affecting a child's

ability to maintain skills and generalize their use in different environments, he

answered "[t]he honest answer is we don't know."  (Id. (Reichle H'rg Test. at

466).)  Finally, the District notes that Dr. Reichle opined that while he thought

more was better with respect to AJT's education programming because she is

highly motivated and an easy learner to motivate, he did not pick "dosage

levels" that were sufficiently different to actually demonstrate that.  (Id. (Reichle

H'rg Test. at 465).)

The District notes that Dr. Reichle's intervention and virtual observations

took place over ten sessions, held two to three times per week over the course of

a three-and-a-half-week period during the COVID-19 pandemic when AJT was

not in school.  (Id. at 20 (Reichle H'rg Test. at 453-54).)  Dr. Wills opined that she

did not know if AJT would make more progress with more hours of instruction.

(Doc. 15 at 201 (Wills H'rg Test. at 537).)  She reviewed Dr. Reichle's data from

his telehealth observations and testified that it was debatable how much progress

AJT made in the timeframe of 4:15 p.m. to 5:30 p.m.—the report showed that AJT

was available to learn at that time when she had not been in school all day

beforehand  (Id. at 206 (Wills H'rg Test. at 559).)  She opined that Dr. Reichle's

data did not demonstrate that a 6.5-hour school day would produce more gains for AJT.  (Id. at 200-201 (Wills H'rg Test. at 535-36).)

The District asserts that the ALJ relied on Dr. Reichle's opinion to order the District to provide an additional one-and-a-half hours of in-home instruction to AJT after school until 6:00 p.m., even though Dr. Reichle testified that no trial lasted beyond 5:30 p.m., so he was not able to gauge AJT's ability to learn after 5:30 p.m.  The District asserts that the ALJ erred in relying on Dr. Reichle's testimony without making any credibility determinations as to the divergent testimony of the District's witnesses.

The Court rejects the District's claim that the ALJ's decision is wrong because Dr. Reichle's testimony is unreliable.  Although Dr. Reichle only conducted ten trials via the internet that consisted of far fewer than 6 hours per day, there is no evidence to contradict his findings that AJT successfully learned from 4:15 to 5:30 p.m.  There is no indication that the paraprofessional at AJT's home did not correctly participate in the trials or that, in other circumstances, AJT was not alert and able to learn at that time.  Although the literature on the efficacy of the intensity and amount of instruction may be "mixed" with regard to students in general, Dr. Reichle had a clear opinion on AJT's ability to learn

with intense and longer instruction based on his interactions with her and her

personal characteristics.  Dr. Reichle's testimony was the best evidence available

to the ALJ regarding AJT's ability to learn at that time and was corroborated by

Ott's testimony regarding AJT's successful learning at that time after a school

day in Kentucky and by AJT's father's testimony.  Moreover, although this trial

took place during the pandemic, the trial consisted of two-sessions-per-day

beginning at noon, which mirrored school conditions as closely as possible, given

the circumstances, which were dictated by a global pandemic.

### 5.     Whether the ALJ's Decision Relies on Factual Errors

The District argues that the ALJ's decision relies on findings inconsistent

with the evidence.  For example, the ALJ found that while reaching agreement as

to the start time of AJT's school day, AJT's parents and the District have never

agreed as to when AJT's day should conclude.  (Doc. 15 at 970 (ALJ Order, Facts

¶ 3).)  The District asserts that, in fact, AJT's parents agreed to the stay-put IEP

that includes a 4:15 p.m. end time by way of implied consent in April 2017.  And,

at one point, AJT's parents themselves suggested a 4:15 p.m. end time to AJT's

school day.

The ALJ also includes a finding that the "District has struggled in making progress on [AJT's] IEP goals and objectives with a four-hour and fifteen minute school day." (Id. at 979 (ALJ Order, Facts ¶ 71).) In support of this finding, the ALJ states as fact that "[a]s Dr. Reichle was preparing the IEE, [AJT's] current special education teacher and case manager, Teresa Elliot, confided that some of the instructional objectives in [AJT's] IEP could not be implemented in the time available during her shortened school day." (Id. & n.71 (citing (Doc. 14-12 at 22 (Hr'g Tr. at 461 (Reichle Test.)).) The District argues that Dr. Reichle's testimony, however, is directly refuted by Elliot's hearing testimony. Elliot testified that she took part in writing AJT's IEP, "[s]o if I didn't feel that we would be able to implement that IEP, I wouldn't write it that way." (Doc. 15 at 800 (Elliot H'rg Test. at 1013).) She testified that she wrote AJT's IEP knowing that AJT attended school from 12:00 to 4:15 p.m. and she wrote the IEP knowing AJT only had 4.25 hours. Thus, she did not tell Dr. Reichle that there was too much on the IEP to accomplish in a 4.25-hour day. (Id. at 804 (Elliot H'rg Test. at 1029-30).)

According to the District, the ALJ provided no credibility assessment that would suggest Dr. Reichle's testimony was more credible or deserved more weight than Elliot's testimony. Indeed, the ALJ includes no reference to Elliot's

testimony with respect to this factual finding.  Additionally, AJT's father agreed

that the statement was similar to his experience with "Kohlhepp when we made

the very difficult decision to remove potty training from [AJT's] goals and

objections because there wasn't enough time."  (Doc. No. 14-6 at 3-4 (AT H'rg

Test. at 73-74).)  When asked whether Dr. Reichle's recommendations could be

implemented during a 4-hour-and-15-minute school day, AJT's treating

neurologist testified, "Then that would be to the – that would be at the expense

of something else occurring during that period of time."  (Doc. 14-11 at 61

(Breningstall H'rg Test. at 289).)

The District also notes that the ALJ made a finding that "[f]or its part, the

District agrees that the amount of instruction should be based upon the number

of hours that [AJT] can remain engaged, active and alert."  (Doc. 15 at 980 (ALJ

Order, Facts ¶ 76).)  The ALJ cites to Dr. Wills' testimony to support this notion;

however, Dr. Wills was not testifying about the hours of instruction generally,

but rather, was answering the question regarding "the method of determining

how much of that ABA instruction [AJT] should have."  (Id. at 201-02 (Wills H'rg

Test. at 539-40).)  Dr. Wills also testified, "[i]t's not the [number of] hours, but

what you do with them." (Id. at 200-01 (Wills H'rg Test. at 535-36).)  The District

asserts that it has taken the timeframe during which AJT is available for learning and offered her an educational program that is highly individualized and designed to provide a FAPE within that timeframe.  AJT begins her day at 12:00 p.m. because that is when she is first available to learn.  Her day is extended beyond the end of the typical school day because that is part of what allows her to make progress appropriate in light of her circumstances.  The District asserts it is under no obligation to provide instruction to its students at all hours of the day during which they are engaged, active, and alert.

The District next takes issue with the ALJ's conclusion that Dr. Shams' suggestion that "one or two hours of instruction was 'good,' 'fine' and sufficient" for a student like [AJT], is not well taken."  (Doc. 15 at 986 (ALJ Order, Conclusions ¶ 8).)  Dr. Shams is the District's expert neurologist.  The District asserts that this is a gross misstatement of Dr. Shams's testimony.

During the hearing, the ALJ asked Dr. Shams if a student with LGS, be it AJT or another LGS patient, was not available for instruction until 3:00 p.m., "would it be your view that an hour from 3:00 to 4:00 would be suitably challenging and beneficial because they have access to peers?"  (Id. at 793 (H'rg Tr. at 984 (Shams Test.))  Dr. Shams answered, "I think many of these patients

58

grow up at—spend significant time at home without peer interaction.  So I think any peer interaction globally is good.  If it's one hour 3:00 to 4:00, great.  So be it. If the baseline is nothing, then one to two hours is fine."  (Id.)  The District argues that the ALJ's decision suggests that Dr. Shams believed AJT is so disabled that she only requires an hour or two of instruction; however, this is not an accurate representation of Dr. Shams's testimony at hearing.

The ALJ also concluded that the District showed "no flexibility in the instruction schedule for [AJT] beyond 4:15 p.m."  (Id. at 983 (ALJ Order, Facts ¶ 99).)  Similarly, the ALJ also found that "[t]he hearing record reflects that the School District's aggressive press for an earlier start time for [AJT] did not follow an individualized assessment of [her] needs, but rather the need to safeguard the ordinary end-of-the-workday departure times for its faculty and staff."  (Id. at 983-84 (ALJ Order, Facts ¶ 101).)  The District argues that these findings are erroneous; it engaged in lengthy and ongoing communications with AJT's family in order to find a way to best understand and serve her needs.

The District argues that it has always remained ready to provide instruction to AJT any time that she is available during the regular school day as it would be for any other District student.  And it has never proposed an IEP

59

with a start time earlier than 12:00 p.m.  It merely offered a flexible start time

option as one of many various suggestions to provide AJT with the opportunity

to access her education program to the same extent as her peers in light of the

District's obligation to include AJT to the maximum extent possible with her

nondisabled peers as required by 34 C.F.R. § 300.114 (setting forth the least

restrictive environment requirement under the IDEA).  The District asserts that,

in response to AJT's parents' request for instruction time for AJT, the District

offered to place trained staff in AJT's home to collect more information regarding

her seizure activity and needs during the morning.  AJT's parents rejected this

offer and the District accepted their decision.

The District argues that it has shown its commitment to flexible scheduling

for AJT by extending her school day beyond the end of the regular school day by

15 minutes when she attended Cedar Island and by 1 hour and 35 minutes when

she attended MGMS.  The District also provided AJT with ESY services that took

place in her home from 12:00 to 3:00 p.m. as opposed to the typical 9:00 a.m. to

12:00 p.m. ESY service provided on school premises.  And the District even

offered to provide the Student with additional hours of ESY services, which the

family declined.

The Court finds that while the ALJ did appear to make a few errors, collectively, the errors do not support reversing the ALJ's decision.

The ALJ erred by finding as a fact that Elliot told Dr. Reichle that "some of the instructional objectives in [AJT's] IEP could not be implemented in the time available during her shortened school day" without making a credibility determination between Elliot and Dr. Reichle because Elliot testified that she did not make that statement and Dr. Reichle testified that she did.  (Doc. 15 at 979 (Doc. 15 at 979 (ALJ Order, Facts ¶ 71).)  However, this error does not alter the Court's overall analysis.

Even accepting Elliot's testimony as true, she stated that she crafted the IEP goals to fit into the limitations of 4.25 hours and so would not have included any goal that could not be accomplished during that time, which does not show that a 4.25-hour-day was appropriate.  Elliot's testimony supports a finding that AJT's IEP goals were limited by the 4.25-hour day.  In addition, Dr. Breningstall testified that implementing Dr. Reichle's recommendations within the 4.25-hour school day would require eliminating other goals for AJT.  AJT's father testified that the District indicated that it was not possible to pursue toilet training due to the length of the day and, thus, AJT's parents agreed to eliminate that goal from

her IEP.  And Dr. Reichle testified that his IEE recommendations could not be implemented when constrained to a 4.25-hour day.  (Doc. 14-12 at 18 (Reichle H'rg Test. at 444-45).)  Therefore, the record still supports the ALJ's decision.

Similarly, the ALJ's statement that Dr. Shams opined that one-or-two hours of instruction for a student like AJT was "'good,' 'fine' and 'sufficient'" appears to be a mischaracterization of his opinion.  In context, Dr. Shams was stating that one or two hours of peer interaction is better than no peer interaction and that this amount of peer interaction for a student like AJT would be "fine" if the baseline was zero.  He was not opining that instruction time of one or two hours was sufficient for AJT.  However, this mischaracterization does not form the basis for the decision that AJT should receive six hours of instruction per day, so it is not material.  See Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580, 259 F. Supp. 2d 880, 885-86 (D. Minn. 2003) (finding disputed issue immaterial to determination of whether child was denied a FAPE and granting judgment for school based on this and other grounds).

On the other hand, the ALJ did not err in stating that AJT's parents and the District have never agreed as to when AJT's day should conclude.  AJT's parents have consistently requested instruction until at least 6:00 p.m. and merely

"agreed" to the 2017 IEP by not responding to it.  At one point, they suggested a 4:15 p.m. end time in the school building, but that was a negotiating point in the context of their knowledge that the District consistently refused anything later and also refused in-home support after school hours.

Likewise, the ALJ's statement that the District showed "no flexibility in the instruction schedule for [AJT] beyond 4:15 p.m." is accurate.  Although the District engaged in ongoing communications with AJT's family to seek a solution that met her needs and provided multiple alternatives, it never offered an alternative with instruction beyond 4:15 p.m.

The ALJ's interpretation of Dr. Wills' testimony is reasonable—Dr. Wills was answering a question about the amount of ABA instruction AJT should have.  AJT's parents maintain that AJT should receive ABA instruction, so it was a reasonable interpretation that Dr. Wills thinks that AJT's instruction overall should be based on how long she "can remain engaged, active and alert."

The ALJ's interpretation that the District's request to observe AJT in the mornings to see if morning instruction would be feasible and its offer of a flexible start time to allow AJT to attend any time before noon on any day when she is able were made solely to provide a standard departure time for its staff is a

factual interpretation that is entitled to due weight.  A reasonable interpretation

of the evidence is that the District was trying to accommodate AJT with a flexible

start time by allowing her extra instructional time when she was available.  And,

since there was no data on how AJT fared during instruction before noon, it was

reasonable for the District to offer to have a professional observe her at that time

to determine if there was a possibility of some manner of morning instruction.

At one point, the District was told by one of AJT's neurologists, Dr. Jason

Doescher, that he thought education earlier in the day would be a possibility and

that attempting to trial that would be "reasonable."  (Doc. 14-16 at 42 (Jan. 28,

2021, Transcript of Recorded Phone Call with District personnel; AT, AJT's

father; and Doescher at 12-13); see also Doc. 14-11 at 56 (Breningstall H'rg Test. at

267) ("Dr. Doescher was apparently somewhat amenable to attempts to modify

[AJT's] schedule to try to start her educational process earlier in the day.").)

However, the ALJ's attribution of a different motivation to the District's

actions is entitled to due deference under the standard of review the Court must

apply in this case.  See K.E., 647 F.3d at 803.  Evidence supporting the ALJ's

interpretation includes AJT's father's clear testimony regarding the adverse

effects AJT has endured from waking up earlier for medical treatments, (see, e.g.,

Doc. 14-6 at 19-23 (AT H'rg Test. at Tr. 89-93)), and Dr. Breningstall's testimony

that starting AJT's school day before noon would lead to an "inevitable

worsening of her problem" and that Dr. Breningstall "can't see on an

experimental basis or otherwise exposing [AJT] to an inevitable worsening of her

problems" (Doc. 14-11 at 57 (Breningstall H'rg Test. at 273-74)).

Therefore, while the ALJ made some factual errors, the errors do not

require that the Court reverse the ALJ's decision.

## IV.   CONCLUSION

Based on the above discussion, the Court concludes that the District has

not provided AJT a FAPE.  AJT requires more than 4.25 hours of schooling a day

to have an educational program that is sufficiently ambitious in light of her

circumstances and that will allow her to meet challenging objectives.   Extending

her instructional day until 6:00 p.m. and including compensatory hours of

instruction as found by the ALJ is the appropriate remedy.  The ALJ's decision is

**AFFIRMED.**

Based on the files, records, and proceedings herein,

**IT IS HEREBY ORDERED**:

1.     Defendant's Motion for Judgment on the Record **(Doc. 43)** is **GRANTED**; and

2.     Plaintiff's Motion for Judgment on the Administrative Record **(Doc. 46)** is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date:   September 13, 2022

s/Michael J. Davis
Michael J. Davis
United States District Court